U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG 10 AM 9:50

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:17-cr-00092 |
| MICKAYLA PETERS, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO DISMISS COUNT I OF THE
INDICTMENT FOR DOUBLE JEOPARDY AND DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE PURSUANT TO THE FOURTH AMENDMENT**
(Docs. 66 & 67)

Defendant Mickayla Peters is charged in a three-count Indictment alleging (1) conspiracy to distribute heroin and cocaine base; (2) possession with intent to distribute heroin and cocaine; and (3) violation of the "crack house" statute, which criminalizes the use of a private residence for drug use or distribution. The conspiracy charge in Count I further alleges that the illegal conduct involved one hundred grams or more of a detectable amount of heroin.

On May 21, 2018, Defendant filed two pre-trial motions which are presently pending before the court. In her first motion, she seeks dismissal of Count I pursuant to the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution on the grounds that Count I charges her with engaging in the same conspiracy for which she has already pled guilty in another pending case. In the second motion, Defendant contends that the government violated the Fourth Amendment to the United States Constitution by tracking a cell phone in the possession of her co-defendant while he was a passenger in her vehicle and by subsequently performing a warrantless search of her vehicle after it was impounded. She seeks suppression of all evidence seized as a result. The government opposes both motions.

On July 30, 2018, the court held a non-evidentiary hearing and thereafter took the pending motions under advisement. Assistant United States Attorney Wendy L. Fuller represents the government. Defendant is represented by Michael J. Straub, Esq.

## I. Factual and Procedural Background.

The government asserts that, beginning in 2015, Vermont Drug Task Force ("VDTF") officers and agents from Homeland Security Investigations ("HSI") began an investigation into the importation and sale of controlled substances in the Newport, Vermont area ("the Newport conspiracy"). In connection with this investigation, the government maintains, Defendant was arrested after selling two hundred bags of heroin to an undercover Drug Enforcement Agency agent, but was not prosecuted in light of her status as a juvenile.

The government proffers that, by the fall of 2015, Defendant and others involved in the Newport conspiracy were regularly traveling to destinations outside of Vermont to purchase controlled substances for re-sale. In December 2015, eight individuals died by drug overdose in Newport, each having consumed drugs which the government alleges were linked to Defendant and her associates. In March 2016, HSI agents from the Derby Line, Vermont field office opened an investigation into a drug distribution ring headed by Defendant's brother, Justin Peters. HSI received information from the VDTF officers that Justin Peters and others were engaged in large scale sales of heroin, cocaine, and cocaine base in and around Orleans County, Vermont.

In February 2017, a federal grand jury returned a series of indictments charging Defendant and others for their roles in the Newport conspiracy during the period from early 2015 to February 2017. The indictment charges Defendant as follows:

Count 1

The Grand Jury charges:

> On or about July 11, 2016, in the District of Vermont, defendant MICKAYLA PETERS knowingly and intentionally distributed fentanyl, a Schedule II controlled substance.

(21 U.S.C. § 841(a)(1))

Count 2

The Grand Jury further charges:

On or about September 1, 2016, in the District of Vermont, defendant MICKAYLA PETERS knowingly and intentionally distributed heroin, a Schedule I controlled substance and fentanyl, a Schedule II controlled substance.

(21 U.S.C. § 841(a)(1))

Count 3

The Grand Jury further charges:

On or about September 7, 2016, in the District of Vermont, defendant MICKAYLA PETERS knowingly and intentionally distributed heroin, a Schedule I controlled substance.

(21 U.S.C. § 841(a)(1))

Count 4

The Grand Jury further charges:

On or about October 4, 2016, in the District of Vermont, defendant MICKAYLA PETERS knowingly and intentionally distributed heroin, a Schedule I controlled substance.

(21 U.S.C. § 841(a)(1))

Count 5

The Grand Jury further charges:

On or about October 25, 2016, in the District of Vermont, defendant MICKAYLA PETERS knowingly and intentionally distributed heroin, a Schedule I controlled substance.

(21 U.S.C. § 841(a)(1))

(Doc. 1, Case No. 17-cr-00017, Feb. 9, 2017.)

According to the government, Defendant attended a proffer session with prosecutors in connection with this indictment, and confirmed that she worked with several other individuals to distribute drugs in the Newport area during the alleged period. She subsequently pled guilty to a Superseding Information related to the Newport conspiracy on July 20, 2017. The Superseding Information pursuant to which Defendant pled guilty states:

## SUPERSEDING INFORMATION

The United States Attorney charges:

From in or about 2015, to in or about February 2017, in the District of Vermont and elsewhere, defendant MICKAYLA PETERS, knowingly and willfully conspired with others known and unknown to distribute heroin, a Schedule I controlled substance, fentanyl, a Schedule II controlled substance, cocaine base, a Schedule II controlled substance, and cocaine, a Schedule II controlled substance.

(21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C))

(Doc. 67-1.)

Defendant was in the community on conditions of release awaiting sentencing when the government alleges she engaged in the further criminal activity that gave rise to a second conspiracy charge. More specifically, at some point during the summer of 2017, the government obtained information that an individual with the alias "G" began distributing heroin and cocaine in the Newport area from Defendant's residence. The government eventually identified "G" as Kenneth Seales, who was familiar to agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") from prior controlled drug purchases. ATF agents allegedly confirmed that Mr. Seales formerly lived in New York City and that he obtained drugs there for re-sale in Vermont.

According to HSI's Report of Investigation ("ROI"), federal agents and VDTF officers obtained federal search warrants for Mr. Seales's real-time cell phone location information beginning on August 24, 2017. The ROI states that Mr. Seales used the subject phone to arrange multiple drug transactions with a confidential informant ("CI") throughout the summer and early fall of 2017. During these transactions, law enforcement allegedly visually confirmed that Mr. Seales's physical location matched the cell location information obtained via the warrant. The government renewed the search warrant on September 22, 2017. Throughout the period of monitoring, Mr. Seales's phone was allegedly determined to be located exclusively in the northeastern portion of the state of Vermont.

In the evening of October 2, 2017, law enforcement ceased receiving real-time location information for Mr. Seales's phone, indicating that it was either off or did not

4

have cellular reception. As a result, law enforcement officers could only obtain historical data which they continued to receive overnight and into the morning of October 3, 2017, when they began efforts to locate Mr. Seales.

At approximately 6:00 p.m. on October 4, 2017, an HSI agent reviewing surveillance footage observed a man matching Mr. Seales's description get into a white Mazda in Newport, Vermont at approximately the same time that real-time information from Mr. Seales's phone was lost. Contemporaneously with this observation, agents resumed receiving real-time location information from Mr. Seales's phone, which indicated that the phone was near White River Junction, Vermont. Noting that this was the first time that location data placed Mr. Seales's phone anywhere outside of northern Vermont, HSI agents alerted VDTF agents who began traveling towards the phone's last known location while HSI provided continuous updates based on incoming location information. As VDTF agents proceeded to the White River Junction area, location information indicated that Mr. Seales's phone was moving north on Interstate 91, until it stopped for several minutes near Wells River, Vermont.

Using this information, VDTF agents responded to a truck stop along the Interstate 91 corridor in Wells River, where they observed a white Mazda with Vermont plate number HCA403. This license plate matched Defendant's registration. When the vehicle exited the truck stop, VDTF agents followed it northbound on Interstate 91 and an agent observed Defendant riding in the front passenger seat. Thereafter, a Vermont State Police ("VSP") trooper initiated a traffic stop on the side of the highway in Barnet, Vermont after observing a traffic violation. VDTF agents informed the VSP trooper that Mr. Seales and Defendant were subject to immediate arrest. Law enforcement discovered five occupants in the vehicle: Mr. Seales, who gave a false name and date of birth; Defendant; a third adult who was driving; and two juveniles. Neither the operator nor Defendant possessed a valid driver's license.

VSP arrested Mr. Seales and Defendant and transported them to the VSP barracks located in Saint Johnsbury, Vermont. VSP also impounded the white Mazda and towed it to the Saint Johnsbury barracks. At the barracks, VSP troopers read Defendant her

*Miranda* rights, which she waived prior to providing an audio and video recorded statement to HSI investigators in which she implicated Mr. Seales and the vehicle's operator in drug possession and distribution. Defendant explained that everyone in the vehicle was returning from New York City and that during the trip, she observed Mr. Seales smoking marijuana and in possession of a small amount of cocaine. She further acknowledged that she was aware that Mr. Seales was involved in drug distribution and that the vehicle's operator had made trips to New York City to transport drugs in the past. She denied that she had observed any drugs in the vehicle, but reported that she had observed Mr. Seales meeting with an unknown person prior to their return. Mr. Seales then returned with a Macy's shopping bag which contained a coat, and placed the bag and its contents in the trunk of her car.

Following Defendant's interview, VSP troopers performed a walk-around of the white Mazda using a drug detection canine. The canine alerted to the trunk of the vehicle, and "based on the totality of the circumstances," HSI agents determined that probable cause existed to perform a warrantless search of the trunk of the vehicle. The search produced 104 grams of heroin, two grams of fentanyl, and 304 grams of cocaine, in addition to two cell phones. The controlled substances were recovered from a jacket pocket of the coat in the Macy's bag. Mr. Seales declined to give a formal interview, but the ROI indicates that he made an unsolicited incriminatory statement that the drugs in the car belonged to him. On October 12, 2017, after her arrest and initial appearance, the grand jury returned the pending Indictment.

## II. Conclusions of Law and Analysis.

### A. Whether Count I Charges Defendant Peters with Involvement in the Same Conspiracy for which She has Already Pled Guilty.

The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. CONST. amend. V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither

be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003).

The Double Jeopardy Clause protects against the: (1) "prosecution for the same offense after acquittal"; (2) "prosecution for the same offense after conviction"; and (3) "multiple punishments for the same offense." *Schiro v. Farley*, 510 U.S. 222, 229 (1994) (internal quotation marks omitted). "Where, however, there is 'no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended.'" *Id.* at 230 (quoting *United States v. Wilson*, 420 U.S. 332, 344 (1975)).[1] Thus, "[a] double jeopardy claim cannot succeed unless the charged offenses are the same in fact and in law." *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003).

The Second Circuit has "long recognized 'the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy.'" *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004) (quoting *United States v. Abbamonte*, 759 F.2d 1065, 1068 (2d Cir. 1985) (*overruled on other grounds by United States v. Macchia*, 41 F.3d 35 (2d Cir. 1994)). Therefore, courts examining successive conspiracy prosecutions for compliance with the Fifth Amendment ask "'whether the second prosecution is for a conspiracy distinct from that previously prosecuted. If the second prosecution is for a distinct conspiracy, there is no double jeopardy problem regardless of an overt act or other evidentiary overlap.'" *Estrada*, 320 F.3d at 180 (quoting *United States v. Gambino*, 968 F.2d 227, 231 (2d Cir. 1992)). The Second Circuit employs a burden shifting framework with regard to Double Jeopardy Clause challenges to successive conspiracy prosecutions. First, the defendant

---

[1] Because the court may only enter a final judgment of conviction after Defendant has been sentenced, Defendant is not yet in jeopardy of a successive prosecution for the same criminal conduct underlying a prior *conviction*. *See Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence. The sentence is the judgment."); *Johnson v. United States*, 623 F.3d 41, 45 (2d Cir. 2010) (citing *Berman* and observing that "sentence is also termed *judgment of conviction*") (internal quotation marks and alterations omitted) (emphasis in original). Both the government and Defendant, however, agree that Defendant may raise a double jeopardy challenge to the pending prosecution, in view of the substantial likelihood that she will be sentenced in accordance with her plea to the Superseding Information prior to the trial in this case.

7

must make "a non-frivolous showing that two indictments in fact charge only one conspiracy[.]" *Lopez*, 356 F.3d at 467. If the defendant succeeds in this showing, "the burden shifts to the prosecution to show, by a preponderance of the evidence, that there are in fact two distinct conspiracies and that the defendant is not being placed in jeopardy twice for the same crime." *Id.*

Comparing the language of the Superseding Information for the Newport conspiracy to which she pled guilty and the Indictment in this case, Defendant contends that "[e]xcept for the nominal gap of 6 months between the two charged conspiracies, the Indictments each charge Defendant with the identical conspiracy." (Doc. 67 at 2.) In support of this argument, she attaches ROIs prepared in relation to this case and notes that both sets of charges stem from law enforcement's investigation of Justin Peters. She further observes that both the Newport conspiracy and the present case involve allegations that she permitted drug sales from her home that Justin Peters was present in when Mr. Seales is alleged to have conducted drug sales, connecting the two conspiracies. Another ROI states that a confidential informant went to Justin Peters's home looking for Mr. Seales, because he believed Mr. Seales was staying there.

The government counters that Defendant was arrested, charged, and pled guilty to her conduct in the Newport conspiracy before she was allegedly involved in an entirely new conspiracy with a different drug supplier, Mr. Seales. None of the indicted Newport co-conspirators are named in the pending case, and the six-month gap between the end of the Newport conspiracy and Defendant's involvement with Mr. Seales establishes Defendant began a new, distinct criminal enterprise after she pled guilty to the Superseding Information. The government further proffered that the first conspiracy involved firearms and suppliers who seldom, if ever, traveled to Vermont, while the pending charges involve a supplier from New York City who traveled to Vermont without a firearm. Finally, the government argues that it could not have charged Defendant with the conduct alleged in the Indictment when it charged her in the Superseding Information because the alleged offense conduct had not yet occurred.

8

In *United States v. Abbamonte*, evidence demonstrated that two charged conspiracies occurred within the same year, with at least two common participants, in the same geographic region, both for the purpose of heroin distribution. The Second Circuit held this evidence sufficient to require the government to prove that the conspiracies were distinct and remanded the case to the district court for consideration of that issue. *See Abbamonte*, 759 F.2d at 1069-70 ("the evidence thus far presented of similar times, places, and personnel suffices to make the jeopardy claim of Abbamonte and DelVecchio more than a matter of speculation."). Here, the court reaches a similar conclusion. The overlap between Defendant and her brother Justin Peters in both cases, the similarity of the drugs and distribution techniques, and the temporal proximity are sufficient to render Defendant's Double Jeopardy claim more than "a matter of speculation." *Id.* at 1070. "[B]ased on the entire record," the court concludes that Defendant has made a non-frivolous showing that the two charged conspiracies are not sufficiently "factually distinct" to permit a successive prosecution. *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004).

Because Defendant has satisfied her initial burden, the government must demonstrate by a preponderance of the evidence that the two prosecutions are not, in fact, the same. To determine whether a conspiracy raises the potential for successive prosecutions for the same crime, the Second Circuit "appl[ies] the so-called *Korfant* factors." *Estrada*, 320 F.3d at 180. This requires consideration of:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994) (quoting *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985) (per curiam)). Applying the *Korfant* analysis to the facts before the court reveals that the first, sixth, and seventh factors suggest

9

successive prosecution for the same conspiracy, while the second, third, fourth, fifth, and eighth factors are neutral, unclear, or favor the government.

With respect to the criminal offenses charged, the Superseding Information and the pending Indictment each allege violations of 21 U.S.C. §§ 846 and 841(a). The Superseding Information, however, also alleges a violation of 21 U.S.C. § 841(b)(1)(C), while the Indictment alleges a violation 21 U.S.C. § 841(b)(1)(B). Both charging instruments accuse Defendant of conspiring with others to distribute heroin and cocaine base. Both conspiracies are alleged to have occurred in the District of Vermont, and both appear to allege that the offense conduct took place primarily in Orleans County near Newport, Vermont. Both conspiracies shared the common objective of distributing heroin and cocaine for profit. The Second Circuit has cautioned that "[s]imilarity at this general level, however, is of limited import." *Macchia*, 35 F.3d at 669.

The Superseding Information and the pending Indictment share some alleged co-conspirators, most notably Justin Peters and Defendant. They also share some overlap in evidence, however, the six-month gap in charged conduct may reasonably be interpreted as the end of one conspiracy and the beginning of a new conspiracy. Although the type of offense conduct is essentially the same, the charged conduct in the present case is comprised of different overt acts. For example, the alleged use of New York City as the source of the controlled substances and Mr. Seales as the primary supplier are materially different from the modus operandi of the Newport conspiracy which consisted of an array of Vermonters traveling to out-of-state locations and obtaining drugs for re-sale. None of the occupants in Defendant's vehicle at the time of her arrest were alleged to have participated in the conspiracy charged in the Superseding Information.

The parties dispute "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other." *Id.* at 671. Defendant contends that Justin Peters was the leader of a distribution organization in Newport that simply turned to Mr. Seales as a new source of supply following the Newport conspiracy arrests and indictments. The government maintains that the two distribution schemes

were wholly distinct and did not rely on or relate to each other. It did not introduce any evidence to support this conclusion so the court accords it no weight.

On balance, the court concludes the government has proffered a preponderance of the evidence "that the two schemes involved distinct agreements" sufficient to render them factually separate crimes for purposes of the Double Jeopardy Clause. *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) (internal quotation marks omitted). The lack of temporal overlap, the new alleged criminal activity by Defendant after her guilty plea, the divergent overt acts, and the paucity of common participants weighs heavily in favor of a finding that they are not factually the same criminal enterprise. *See Estrada*, 320 F.3d at 181 (noting that "a single common actor in what are allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy.") (internal quotation marks omitted). Where "[t]he Government's charges [are] narrowly drawn"; "carefully limited in time and place"; "[t]he dates in the two indictments do not overlap"; "and the indictments name some different conspirators[,]" the Double Jeopardy Clause is not offended by successive prosecutions. *United States v. DeFillipo*, 590 F.2d 1228, 1234 (2d Cir. 1979) (footnote omitted). Defendant's motion to dismiss Count I of the Indictment is therefore DENIED.

> B. **Whether Tracking Mr. Seales's Cell Phone While it was Physically Present in Defendant's Vehicle Violated her Rights Under the Fourth Amendment.**
>
> The Fourth Amendment provides that, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.

*Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528 (1967). "[W]ell into the 20th century, . . . Fourth Amendment jurisprudence was tied to common-law trespass." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). However, "later cases[] . . . have deviated from that exclusively property-based approach." *United States v.*

11

*Jones*, 565 U.S. 400, 405 (2012) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Under the Supreme Court's modern Fourth Amendment jurisprudence, an unlawful search can occur in the context of certain government trespasses or "when government officers violate a person's 'reasonable expectation of privacy[.]'" *Id.* 406 (quoting *Katz*, 389 U.S. at 360).

"A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Conceding that she does not have standing to challenge the validity of the warrant authorizing the real-time location monitoring of Mr. Seales's cell phone, Defendant instead argues that evidence obtained by tracking Mr. Seales's cell phone, including the traffic stop which resulted in her arrest, is inadmissible against her absent a warrant because she had a reasonable expectation of privacy in her vehicle and her own real-time location information. As the Supreme Court has recently reaffirmed, in *United States v. Jones* "five Justices agreed that . . . privacy concerns would be raised by, for example, surreptitiously activating a stolen vehicle detection system in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone." *Carpenter v. United States*, 138 S. Ct. 2206, 2215 (2018) (internal quotation marks omitted). In *Carpenter*, the Supreme Court further concluded that a warrant is required to access historical cell site information broadcasted from a target phone and stored in a corresponding business record by a cellular service provider. *See id.* The Fourth Amendment also requires a warrant before attaching a GPS tracking device to a motor vehicle. *See Jones*, 565 U.S. 400, 404 (2012) ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'") (footnote omitted). Defendant contends that, in light of these precedents, the government must obtain a warrant before private citizens are inadvertently tracked through real-time cell site location information obtained by surveillance of another target. She acknowledges that, thus far, no court has adopted this approach.

The fact that Mr. Seales's cell phone happened to be located in Defendant's vehicle does not render the government's actions unconstitutional. There is no evidence that the government intentionally sought to obtain Defendant's location through the real-time location information pertaining to Mr. Seales's phone. Instead, it was pure happenstance that Mr. Seales entered Defendant's vehicle as opposed to her home or the vehicle or home of some other individual. There was thus no way the government could predict in advance that it would need a second search warrant for Defendant's real-time location if she happened to be in proximity of Mr. Seales's cell phone. The approach Defendant advocates is thus wholly unworkable.

Although the government does not dispute that the officers monitoring Mr. Seales's location were aware that Defendant was also a target of the same investigation, her status as a person of interest does not materially alter the analysis because the government was not actively tracking her location. *See New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) ("the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'") (quoting *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921)). Even if the government believed that Defendant might come into contact with the target cell phone, such a belief is immaterial in light of a facially valid warrant authorizing the government to track the phone itself.

Accordingly, even if Defendant possessed a reasonable expectation of privacy in her real-time location information, the government did not violate that expectation and was not required to obtain a second warrant prior to arresting her. Any other conclusion would lead to unworkable and unreasonable results. *See Riley v. California*, 134 S. Ct. 2473, 2482 (2014) ("As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness.") (internal quotation marks omitted). For the foregoing reasons, Defendant's motion to suppress evidence obtained through a search of Mr. Seales's cell location information "at all times that the cell phone was located in her residence or automobile and the fruits of such evidence" is DENIED. (Doc. 66 at 1.)

C.  **Whether the Warrantless Search of Defendant's Vehicle While Impounded at a VSP Barracks Violated the Fourth Amendment.**

As a general rule, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357 (footnotes omitted). "One such exception is the 'automobile exception.'" *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010). "'[C]ontraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant'" so long as there is "'probable cause for believing that [the] vehicles are carrying contraband or illegal merchandise.'" *United States v. Ross*, 456 U.S. 798, 808 (1982) (quoting *Carroll v. United States*, 267 U.S. 132, 153-154 (1925)). A search of a vehicle "is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." *Id.* at 809 (footnote omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825.

Defendant disputes that the automobile exception to the warrant requirement applies to the search of her vehicle after it was impounded for two reasons. First, she contends that the traffic stop was the fruit of what she argues was the government's illegal tracking of Seales's phone while it was in her vehicle. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (directing courts to consider "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.") (internal quotation marks omitted). Second, she argues that even if law enforcement had probable cause to search her vehicle after it was impounded, a drug detection canine alerted to the trunk of the white Mazda only after the vehicle could no longer readily be moved, rendering the "automobile exception" inapplicable.

Defendant's first argument is easily disposed of in light of the court's conclusion that Defendant's arrest was the product of lawful cell phone tracking of a cell phone in her vehicle. Defendant's second argument is similarly unavailing. Although the "first

14

cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's ready mobility," "recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (internal quotation marks omitted). Thus, although the automobile exception arose from a vehicle's "capacity to be 'quickly moved[,]'" *California v. Carney*, 471 U.S. 386, 390 (1985) (quoting *Carroll*, 267 U.S. at 153), the United States Supreme Court has clarified that "if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle." *California v. Acevedo*, 500 U.S. 565, 570 (1991).

"[P]robable cause exists 'where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' evidence of a crime will be found in the place to be searched." *Gaskin*, 364 F.3d at 456 (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotation marks omitted)) (alterations in original). "The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." *Id.* at 457 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

At the time police performed the traffic stop which resulted in Defendant's arrest and her vehicle's impoundment, law enforcement knew that she was traveling with Mr. Seales, a suspected distributor of illegal drugs through a series of controlled buys; that they were returning from an out-of-state location known to be a source of controlled substances; that the vehicle was registered to Defendant; and that Defendant was involved in drug distribution in Vermont by hosting and assisting Mr. Seales. Viewing these facts in their totality, HSI agents and VDTF officers possessed probable cause to believe that Defendant's Mazda may contain controlled substances at the time of the stop.[2] As a result, they did not need a warrant to search any compartment of the car

---

[2] A drug detecting canine confirmed this suspicion.

15

which was capable of storing illegal drugs, including the trunk where heroin was eventually discovered. *Ross*, 456 U.S. at 825. Defendant's motion to suppress on the grounds that police improperly searched the Mazda without a warrant is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Count I for double jeopardy (Doc. 67) and motion to suppress evidence (Doc. 66) are DENIED.
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10th day of August, 2018.

Christina Reiss, District Judge
United States District Court